WR-84,163-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/28/2015 11:12:16 AM
Accepted 12/29/2015 4:24:35 PM
ABEL ACOSTA
CLERK

IN THE COURT OF CRIMINAL APPEALS

RECEIVED IN
COURT OF CRIMINAL APPEALS

December 29, 2015

ABEL ACOSTA, CLERK

AT

AUSTIN, TEXAS

EX PARTE KYLE CARPENTER DIETRICH

WRIT NO. WR-84,163-01
IN THE COURT OF CRIMINAL APPEALS

\*\*\*\*\*\*\*\*

CAUSE NO. 1072796-A
IN THE 178TH DISTRICT COURT
HARRIS COUNTY, TEXAS

## STATE'S OBJECTIONS TO THE TRIAL COURT'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER RECOMMENDING THAT RELIEF BE GRANTED

Comes now the State of Texas, through the undersigned Assistant District Attorney, and respectfully objects to the trial court's *Findings of Fact and Conclusions of Law* and *Recommendation and Order* entered on October 9, 2015, recommending that relief be granted in the form of a new trial. In support, the State would show the following:

I.

Procedural History

On June 20, 2006, Kyle Carpenter Dietrich, the applicant, was indicted for aggravated sexual assault of a child in cause no. 1072796 ("the primary case").

Charles Thompson ("Thompson") and John Morgan ("Morgan") represented the applicant at the trial level. Todd Keagle, former Harris County prosecutor, represented the State at trial. The Honorable Mary Bacon presided over the primary trial.

The State presented evidence at the guilt/innocence phase that the first time the applicant sexually assaulted the complainant was in early May of 2000 when she was thirteen (13) years old; that the applicant told the complainant they were going to Wal-Mart, but drove her onto a dirt road and parked in a grove of trees out of sight from the roadway; that he grabbed the complainant by the back of her head by the hair and forced his penis into her mouth; that he continued to push her head up and down on his penis; that when the applicant climaxed, he shoved the complainant's head so far down on his penis that she gagged and his semen came out of her nose; that the applicant instructed her not to tell her mother about the molestation in such a manner that she interpreted his directive as a death threat; that they continued to Wal-Mart where the applicant bought her a Coke to get the taste out of her mouth; and that she did not tell anyone about the assault at the time (III R.R. at 22-27, 32, 39-40).

The complainant also testified at trial that a week later she and the applicant were at home alone when he called her into his bedroom; that he removed her clothes and penetrated her vagina with his penis; that when she began crying and told him that it hurt, he placed a pillow over her head; that she did not tell her mother, Linda Dietrich, about this assault either, because she feared that the applicant would kill her;

2

that the applicant continued to rape her for the next two years; that sometimes he assaulted her about three times a week and other times several months passed without an assault; that she estimated that the applicant had sexual intercourse with her about fifty (50) times and anal sex once; that the applicant forced her to perform oral sex on him about twenty-five (25) times; that after suffering this abuse for two years, she moved into her biological father's home to escape; that she remained there for about eight (8) months, despite the fact that it was difficult living with her alcoholic father; that while she was living with her father, the applicant suffered a serious head injury that left him in a coma for a while; that when he came out of the coma, he had to relearn many basic human functions such as eating and walking; that given the applicant's condition, she figured that he could no longer hurt her, so she decided to move back to her mother's house to help care for her little brothers; and that when she was seventeen (17) years old, the applicant managed to rape her one more time despite his injury (III R.R. at 15-17, 27-28, 33-36, 41-42, 47, 61-62).

On June 29, 2007, following a jury trial in which the applicant was found guilty of aggravated sexual assault of a child, the jury assessed his punishment at thirty-three (33) years confinement in the Texas Department of Criminal Justice – Institutional Division.

On July 30, 2007, the applicant, represented by Clyde Williams, filed a motion for new trial in the primary case alleging that: (1) the evidence was insufficient to establish venue in Harris County; (2) trial counsel entered into an agreement with

Linda Dietrich that created a conflict of interest; and (3) trial counsel provided ineffective assistance at trial by failing to call certain witnesses and present "material evidence" (Supp. C.R. at 1-30).

The Honorable Roger Bridgwater presided over the motion for new trial hearing held from August 31, 2007 through September 7, 2007.

On September 7, 2007, after receiving evidence and argument on the claims in the applicant's motion for new trial, Judge Bridgwater denied this motion (Supp. C.R. at 4) (X R.R. at 69-70).

On March 31, 2009, the Fourteenth Court of Appeals delivered an unpublished opinion affirming the trial court's judgment in cause number 1072796. *Dietrich v. State*, No. 14-07-005410-CR (Tex. App. – Houston [14th Dist.] 2009)(not designated for publication).

On October 28, 2009, the Court of Criminal Appeals refused the applicant's petition for discretionary review.

On January 14, 2011, habeas counsel Josh Schaffer filed an application for writ of habeas corpus on the applicant's behalf, cause number 1072796-A, challenging the applicant's conviction in the primary case on the grounds of ineffective assistance of counsel in the guilt and punishment stages of trial.

On January 26, 2011, the trial court entered an order designating issues that needed resolution in the instant habeas proceeding.

4

On June 6, 2013, the applicant filed an amended application for writ of habeas corpus, cause number 1072796-A, alleging grounds of ineffective assistance of counsel in the guilt and punishment stages of trial.

On March 5 and 6, 2015, The Honorable David Mendoza, presiding judge of the 178th District Court of Harris County, Texas, conducted an evidentiary hearing as part of the instant habeas proceeding, which included the testimony of trial counsel, Charles Thompson.

On October 9, 2015, the trial court signed the applicant's findings of fact and conclusions of law, and recommended that habeas relief be granted in the form of a new trial.

The State respectfully disagrees with the trial court's ultimate recommendation granting habeas relief. The State objects to the trial court's findings of fact and conclusions of law which are not supported by the record or established law.

II.

Applicable Law

The trial court's findings and conclusions are not supported by the law, the evidence elicited at trial, and the evidence from the habeas proceedings. This Court has stated:

5

It is a fundamental principle of our habeas corpus law and regularly stated that under the procedure authorized by Article 11.07, if the trial court convenes a hearing, elicits testimony and thereby develops facts, the Court of Criminal Appeals is not bound by the trial court's findings and conclusions of law. Accordingly, this Court is obligated to determine if the record developed supports the trial judge's findings. *Ex parte Young,* 479 S.W.2d 45 (Tex. Crim. App. 1972). If the record will not support the trial judge's conclusions, then this Court may make contrary findings. *Ex parte Davila,* 530 S.W.2d 543 (Tex. Crim. App. 1975); *Ex parte Bagley,* 509 S.W.2d 332 (Tex. Crim. App. 1974); *Ex parte Williams,* 486 S.W.2d 566 (Tex. Crim. App. 1972).

*Ex parte Adams,* 768 S.W.2d 281, 288 (Tex. Crim. App. 1989).

Because the record does not support the trial court's findings of fact and conclusions of law in the instant case, the State urges the Court of Criminal Appeals to make contrary findings of fact, and deny habeas relief in the instant cause.

## III.

The trial, appellate, and habeas records in the instant case do not support the trial court's October 9, 2015 recommendation for a new trial, and the State specifically objects to the trial court's findings of fact and conclusions of law regarding defense counsel, Charles Thompson; the challenges for cause in voir dire; the admission of testimony regarding the applicant's and his ex-wife's prior drug use; the impeachment of the complainant; the decisions to call certain witnesses; the extraneous sexual assaults; the investigation of an out-of-state case; the advice to the applicant in the punishment phase; and whether defense counsels' conduct was deficient in any manner that prejudiced the applicant.

6

> **Trial Court's Finding of Fact 31**
>
> **Thompson left employment as an Assistant District Attorney at the Harris County District Attorney's Office in 2005 because of a lack of productivity (1 H.R.R. 20). He had been a criminal defense lawyer less than two years when he tried applicant's case (1 H.R.R. 21).**

The trial court makes no finding about, and seemingly fails to consider, Thompson's extensive trial experience prior to representing the applicant in the primary case. As a prosecutor for eight (8) years, Thompson tried sixty (60) cases to a jury, about twenty-five (25) of which were of a sexual nature (II W.H. 95).[1] In his criminal defense practice from 2005 until the applicant's trial, he had already had nine (9) trials, three (3) which were of a sexual nature (II W.H. at 96).

In fact, John Morgan, who was originally hired by the applicant, brought Thompson in as lead attorney because of his prior experience and expertise (II W.H. at 97). Morgan testified on this issue during the hearing on the applicant's motion for new trial, specifically that Thompson was brought in to be lead counsel because he had "much more experience than [Morgan] did on this type of case;" that the applicant agreed with Morgan's decision to bring in Thompson; and that although Morgan had been a lawyer for thirty-six years and had trial experience, he thought they needed to "bring in a pro" (VII R.R. at 16 and 25-26).

---

[1] References to the court reporter's record from the post-conviction writ hearing are denoted as "W.H."

Thus, Finding of Fact 31 ignores much of the record on this issue, and is misleading as to Thompson's actual background and experience.

<u>ADVICE ON WHETHER TO ACCEPT THE STATE'S PLEA OFFER</u>

**Trial Court's Finding of Fact 35**

**The State offered applicant a plea bargain of five years deferred adjudication probation for an offense that carried a ten-year requirement to register as a sex offender (1 H.R.R. 41). Applicant rejected the plea bargain based on Thompson's advise that it was a "very triable case" (1 H.R.R. 42, 44).**

The State objects to the last sentence in the Trial Court's Finding of Fact 35, because the finding only includes part of the advice Thompson gave the applicant regarding the decision to plead guilty. Thompson testified more fully about this issue in the writ evidentiary hearing during his cross-examination, as follows:

STATE: Let's talk about – a little bit about the offer that Mr. Dietrich was made in this case. You advised him that you felt like it was a defensible case; is that correct?

THOMPSON: That's correct.

STATE: Do you think that's reasonable advice based on the State's evidence at the time?

THOMPSON: Yes.

STATE: And you also advised him that you thought the State's offer five years deferred adjudication and only having to register as a sex offender for ten years was a really good offer?

8

THOMPSON: Yes. I communicated the offer to him, and that was something he should consider.

STATE: Do you think that's reasonable advice under the circumstances?

THOMPSON: Yes. And I - - though I operated kind of under the - - you know, it's - - you work for the client and a big decision like that I would leave to the client.

STATE: Well, of course. You can't make somebody plead guilty, right?

THOMPSON: Correct.

(II W.H. at 108-109).

Therefore, the trial court's finding that the applicant's decision was based on only a portion of the advice given by defense counsel is not supported by the habeas record.

THOMPSON'S SECOND AFFIDAVIT

**Trial Court's Finding of Fact 40**

**Thompson met with habeas prosecutor Baldwin Chin twice (1 H.R.R. 77). Thompson testified that Chin suggested what to say in the affidavit and did not tell him that Chin already had filed an answer on behalf of the State (1 H.R.R. 73, 80). Thompson gave the affidavit in February of 2014, three years after his first affidavit and almost seven years after the trial (1 H.R.R. 73, 80).**

The State objects to the portion of Trial Court's Finding of Fact 40 that the habeas prosecutor "suggested" to Thompson what to say in his affidavit. A review of Thompson's testimony in the writ hearing on the pages cited in the above finding

9

reveals no testimony to support this finding, and only provides details about Thompson's meetings with the prosecutor, the timing of his second affidavit, and whether Thompson knew if the State had filed an answer to the instant writ application (I W.H. at 73, 77, and 80).

The issue of whether the habeas prosecutor "suggested" to Thompson what to put in his second affidavit was addressed during the writ evidentiary hearing. In fact, a review of Thompson's testimony reflects that, despite habeas counsel's attempts to characterize Thompson's meetings with the habeas prosecutor as suspicious, Thompson was clear that the issues in the writ were discussed and he executed his second affidavit after these discussions.

This issue is first addressed in the exchange between habeas counsel and Thompson, as follows:

> SCHAFFER: You said as much in your second affidavit, correct?
>
> THOMPSON: Yes.
>
> SCHAFFER: Okay. Did Mr. Chin suggest to you that there was something wrong with your first affidavit?
>
> THOMPSON: No. I mean, in having done this in the past, either side that wants to talk to me I'll talk to them, either side that wants an affidavit, I do an affidavit for them, and Mr. Chin asked me and I said I would.
>
> SCHAFFER: Okay. Did he type the affidavit while you were in his office?

THOMPSON:      Not to the final form. I mean, **as we discussed things, he would type**, which I assume he was typing on the affidavit, and then probably the next day I got an e-mail from Mr. Chin with the affidavit attached.

(I W.H. at 79)(emphasis added). Then, Thompson more directly explains what he means by the word "suggest" in the following lengthy exchange with habeas counsel:

SCHAFFER:      Did he [Chin] **suggest** to you at all what to say in your second affidavit?

THOMPSON:      Well, yeah, I mean, **we discussed what - - what the answers would be.**

SCHAFFER:      Did he **suggest** to you what the answers should be?

THOMPSON:      **No. Did I ever feel like he was telling me you need to say X, Y or Z, no.**

SCHAFFER:      No, I didn't ask did he tell you what to say. I asked did he ever suggest to you what the answers should be?

STATE:      Your Honor, I'm going to ask that any instructions to the witness come from the court and not form [sic] habeas counsel.

COURT:      Well, he didn't answer his questions, he did say - - suggest in the first question. But anyway, go ahead.

SCHAFFER:      Did Mr. Chin ever **suggest** to you what your second affidavit should contain?

THOMPSON:      **I would have to say yes in the sense he looked at whatever the issue was and he'd go, "Well, why don't you read this part," you know, and, "what does that mean to you? Does it mean this, does it mean that." So, I would have to answer, yes.**

COURT:      When you say, "Why don't you read this part," this part of the record?

11

THOMPSON:      Record. Yes, sir. I apologize, your Honor.

COURT:      That's all right.

SCHAFFER:      Would he **suggest** to you explanation or strategies that you might have had that were not included in the first affidavit?

THOMPSON:      **No, in that - - I mean, it was more of let's expand on this.**

(I W.H. at 81-83)(emphasis added); *see also* (II W.H. at 12-13)(another exchange with intermittent use of words "suggest" and "discuss").

Finally, during Thompson's cross-examination, he clarified for the record the circumstances of providing his second affidavit:

STATE:      So during these discussions, were you - - I wasn't there, so were you bantering back things, back and forth? I mean, you testified earlier that he was showing you parts of the record and then you'd discuss it; is that right?

THOMPSON:      Correct.

STATE:      So can you explain - - because you can see how it sounds kind of bad to say he suggested something to you. Can you see how that of sounds negative (sic)?

THOMPSON:      Yes, I understand. The - - I mean, it was - - I mean, he's sitting behind his desk and I'm sitting in one of the guest chairs, and we're - - **we're talking about different things.** And, as you do that, he would type it a certain way, and then maybe there were changes made or what have you.

          **It was definitely give and take,** and at no time was - - did I feel like, by either counsel, that they were saying you have to say this or else, you know.

STATE:      Great. And that would be improper, right?

THOMPSON:        Correct.

STATE:           We all agree that would be improper, right?

THOMPSON:        Yes.

STATE:           And so if Mr. - - if you - - if in these discussions he talked - - you talked about potential strategies and things like that, that would not on its face be improper, would it?

THOMPSON:        I don't believe so.

STATE:           And so I guess you really answered my question, but just to wrap up this area, did Mr. Chin ever tell you what to put in your affidavit or what to say?

THOMPSON:        No.  And he said I was - - both counsel said I was free to make any changes that I felt appropriate.

STATE:           And did you feel like you were free to do that?

THOMPSON:        In both instances, yes.

(II W.H. 102-104)(emphasis added).

Therefore, the State objects to the portion of Trial Court's Finding of Fact No. 40 that the habeas prosecutor "suggested" to Thompson what to say in his affidavit, as it unfairly characterizes the circumstances of Thompson providing his second affidavit and ignores much of the habeas record where this is explained in detail.

13

**Trial Court's Finding of Fact 44**

**The court asked [Linda] McKay the hypothetical question of whether she could tell her sister if she were on a jury that acquitted someone of aggravated sexual assault of a child; she said that she could (2 R.R. 186). This answer did not rehabilitate her, as the question presented was unrelated to her ability to be fair and impartial.**

**Trial Court's Finding of Fact 45**

**It was the role of the prosecutor, not the court, to try to rehabilitate McKay. <u>Post v. State</u>, 936 S.W.2d 343, 347 (Tex. App. — Fort Worth 1996, pet. ref'd), <u>overruled on other grounds</u>, <u>Justin Jay Shot With Two Arrows v. State</u>, 64 S.W.3d 606 (Tex. App. — Fort Worth 2001, no pet.); <u>see also</u> <u>Burke v. State</u>, 2012 WL 2415524, \*4 (Tex. Crim. App. 2012) (not designated for publication).**

The State objects to the above findings related to the challenge for cause to venireperson, Linda McKay. The record reflects that Judge Bacon questioned McKay at the bench about her possible bias as a juror based on her sister's job as a police officer handling child abuse cases and, after hearing her responses and observing her demeanor, body language, and tenor of voice, concluded that McKay would not be biased (II R.R. at 185-86)(II W.H. at 17). The record does not support a challenge to this ruling in light of McKay's vacillating and contradictory responses on this issue. *See Patrick v. State*, 906 S.W.2d 481, 488 (Tex. Crim. App. 1995) (great deference is given to the trial court's decision of whether or not to grant a challenge for cause, because of the trial judge's ability to observe the venireperson).

14

Further, the cases cited in Finding No. 45 not only have no precedential value with respect to the Court of Criminal Appeals, but are also distinguishable on their facts. Unlike in the instant case, there was no equivocation after the initial indications of bias in *Post* and *Burke*. *See Post v. State*, 936 S.W.2d 343, 347-48 (Tex. App. — Fort Worth 1996, pet. ref'd), *overruled on other grounds*, *Justin Jay Shot With Two Arrows v. State*, 64 S.W.3d 606 (Tex. App. — Fort Worth 2001, no pet.) (holding that venirepersons failing to raise their hand in response to a group question from the judge was insufficient to recant their earlier clear statements to the contrary); *Burke v. State*, 2012 WL 2415524, *4 (Tex. Crim. App. 2012)(not designated for publication) (no attempt to rehabilitate venireperson after he professed bias and even confirmed that position at the bench).

This finding also attempts to mischaracterize Judge Bacon's questioning as being done in an attempt to rehabilitate McKay rather than "for the purpose of clarification or in order to expedite the proceedings." *Post*, 936 S.W.2d at 347 (holding that the trial court did not erroneously interfere with the voir dire process by asking questions in order to clarify a juror's position or instruct a juror (citations omitted)).

Thus, the record does not support the trial court's findings with respect to venireperson McKay.

**Trial Court's Finding of Fact 49**

A defendant is entitled to have jurors who can consider the full range of punishment applicable to his case. Fuller v. State, 829 S.W.2d 191, 200 (Tex. Crim. App. 1992). Where it is clear from a venireman's response that he cannot consider the full range of punishment, he is deemed biased as a matter of law, and a challenge for cause must be granted. Cooks v. State, 844 S.W.2d 697, 709 (Tex. Crim. App. 1992).

**Trial Court's Finding of Fact 50**

Crutcher was biased as a matter of law. Johnson v. State, 982 S.W.2d 403, 406 (Tex. Crim. App. 1998).

**Trial Court's Finding of Fact 52**

The prosecutor elicited that Crutcher thought that she could consider the full range of punishment. Crutcher did not unequivocally assert that she would set aside her personal beliefs, follow the court's instructions, and consider the full range of punishment. The prosecutor asked, ". . . is probation just not even an option, not on any sort of case, period?" She replied, "No, I don't take it to that extreme." Crutcher's answer was not vacillating, unclear or contradictory. The prosecutor then asked, "So you could consider the full range of punishment? She replied, "I think so" (2 R.R. 181).

**Trial Court's Finding of Fact 53**

Thompson did not believe that Crutcher was rehabilitated (1 H.R.R. 101-02; 2 H.R.R. 217). He admits that he should have preserved error by challenging her for cause and, if necessary, requesting an additional peremptory challenge and objecting to the jury that was impaneled (Thompson Supp. Aff. At 5; 1 H.R.R. 105). Instead, he used a peremptory challenge on her (C.R. 51).

**Trial Court's Finding of Fact 54**

The court probably would have granted a challenge for cause where Crutcher initially said that she could not consider probation, the court indicated that it was going to excuse her, and the prosecutor did not completely rehabilitate her.

16

**Trial Court's Finding of Fact 55**

**Thompson performed deficiently in failing to challenge Crutcher for cause and preserving error.**

The State objects to Trial Court's Findings of Fact 49, 50, and 53 thru 55 regarding venireperson, Donna Crutcher, as not supported by the record and contrary to established law.

The trial court's findings that venireperson Crutcher was biased as a matter of law overlook the fact that she was rehabilitated at the bench with her responses that she believed she could consider the full range of punishment. (II R.R. at 181); *Cooks v. State*, 844 S.W.2d 697, 709 (Tex. Crim. App. 1992) (citing *Anderson v. State*, 633 S.W.2d 851, 854 (Tex.Cr.App.1982) that "where the juror states he believes that he can set aside any influences he may have, and the trial court overrules a challenge for cause, its decision will be reviewed in light of all the answers the prospective juror gives"). Her rehabilitation was also reflected in both of the affidavits Thompson executed in the instant habeas proceeding providing that he did not challenge Crutcher for cause because he believed that Crutcher's responses during the questioning of her at the bench were sufficient to overcome a challenge for cause and that any challenge for cause to Crutcher would be futile. Thus, even though Thompson agreed with habeas counsel during the writ evidentiary hearing that Crutcher's answer to Keagle's question about the punishment range on "any sort of case" would not have been sufficient to rehabilitate her, Thompson's personal belief

17

at the time of trial was that Keagle was asking about an aggravated sexual assault of a child case - a reasonable assumption based on the context and circumstances of the exchange (II R.R. at 181)(I W.H. at 105)(II W.H. at 118-22).

The State also objects to Trial Court's Finding No. 54 that Judge Bacon "probably" would have granted a challenge for cause against Crutcher, because there is nothing in the record to support this speculation. Likewise, a review of the complete appellate and habeas records does not support the finding that Thompson's conduct was deficient in failing to challenge Crutcher for cause, because the totality of Crutcher's responses to the *voir dire* questioning did not sufficiently establish that Crutcher was unable to consider the full range of punishment, which included probation and, at a minimum, reflected that Crutcher's responses were vacillating or contradictory. *See King v. State*, 29 S.W.3d 556, 568 (Tex. Crim. App. 2000) (trial court's decision in whether to grant a challenge for cause is given particular deference when the venireperson's answers are vacillating, unclear, or contradictory).

**Trial Court's Finding of Fact 57**

**Thompson believed that [Ralph] Green's answer was unequivocal, that he was biased as a matter of law, and that there was no basis to rehabilitate him (1 H.R.R. 108-09)**

**Trial Court's Finding of Fact 61**

**Thompson admits that he should have preserved error by challenging Green for cause and, if necessary, requesting an additional peremptory challenge and objecting to the jury that was impaneled (Thompson Supp. Aff. at 5; 1 H.R.R. 112-13). His conduct constituted deficient performance.**

18

**Trial Court's Finding of Fact 62**

**Thompson performed deficiently in failing to preserve error from the denial of the challenge for McKay and in failing to challenge Crutcher and Green for cause and, if necessary preserve error from the denial of those challenges.**

The State objects to the Trial Court's Findings of Fact 57, 61, and 62, as they are not supported by the record and are contrary to clearly established law.

The record reflects that, although Green initially expressed during *voir dire* that he would have a bias based upon his knowledge about his girlfriend being sexually abused as a child, he was rehabilitated based on his response that he would be fair and open-minded if he was a juror in the primary case when the trial judge questioned Green further at the bench about his possible bias (II R.R. at 97-98, 187). Thompson testified at the writ evidentiary hearing that "looking back" he believes he should have challenged Green for cause (I W.H. at 110-12). However, Thompson did not challenge Green for cause because at the time he reasonably believed that Green's responses during the questioning at the bench were sufficient to overcome a challenge for cause, and that any challenge for cause to Green would be futile. *Thompson's Supp. Affidavit*; (I W.H. at 110-12).

A review of the appellate and habeas records does not support the above findings of deficient conduct in that the totality of Green's responses to the *voir dire* questioning did not sufficiently establish that Green would be biased and, at a minimum, reflected that Green's responses were vacillating or contradictory. *See*

19

*Garcia v. State*, 887 S.W.2d 846, 858 (Tex. Crim. App. 1994) (holding that the trial court did not abuse its discretion in denying challenge for cause against a vacillating venireperson where, even assuming that he was biased against the defendant, "he was able to set his preconceptions aside"). Further, Thompson's testimony that "looking back" he might have done something different does not support a finding of deficient conduct in that "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland v. Washington*, 466 U.S. 668, 669 (1984).

Thus, the trial court's findings of deficient conduct with respect to venireperson Green are not supported by the record and are contrary to established law.

**Trial Court's Finding of Fact 63**

**Had the challenges for cause been granted, or had the defense received additional peremptory challenges to strike these veniremen, Thompson would have used the remaining peremptory challenges on objectionable veniremen who ultimately served on the jury (AX 2 at 2-3; 2 R.R. 190). Claudia Kolker (venireman 5) had a nephew who was sexually assaulted (2 R.R. 101); Celeste Swanson (venireman 38) was married to a retired police officer (2 R.R. 37-38); Judith Williams (venireman 47) had a close friend from college who was molested by her father and had served on a jury that convicted the defendant (2 R.R. 100, 149); and Dovie Husch (venireman 52) also had served on a jury that convicted (2 R.R. 150).**

The State objects to Trial Court's Finding of Fact 63, as a speculative finding that is not supported by a review of the trial and habeas records. Even assuming,

20

*arguendo*, that Thompson had been granted additional peremptory challenges, he would not have necessarily used them to strike venirepersons 5, 38, 47, or 52, especially in light of the fact that these names were provided to him by habeas counsel years after the trial of the primary case, and the reasons provided as a basis to strike them fail to take into account any other responses from the venirepersons, both verbal and nonverbal, that Thompson would have been aware of at the time his strikes were made. *See, e.g.* (II R.R. at 154)(venireperson 5 stated that when assessing punishment "rehabilitation" was more important to him than "punishment); (II R.R. at 158)(venireperson 38 responded that "rehabilitation" was more important to him than "punishment"); (II R.R. at 122)(venirepersons 47 and 52 answered the scaled question from "0-10" regarding presumption of innocence where "0" was the most favorable to the defense at "2" and "0", respectively).

The foregoing discussion demonstrates that Trial Court's Finding of Fact 63 does not find support in a review of the trial and habeas records.

**Trial Court's Finding of Fact 64**

**Had Thompson preserved *voir dire* error, the conviction would have been reversed on appeal. See Hernandez v. State, 563 S.W.2d 947, 948 (Tex. Crim. App. 1978). Thompson performed deficiently in failing to do so. See Winn v. State, 871 S.W.2d 756, 762-63 (Tex. App. — Corpus Christi 1993, no pet.) (counsel ineffective in failing to preserve voir dire error regarding biased venireman, on whom he exercised peremptory strike, where objectionable juror served); Montez v. State, 824 S.W.2d 308, 310 (Tex. App. — San Antonio 1992, no pet.) (counsel ineffective in failing to preserve error after court denied challenge for cause of biased venireman); State v. Garza, 143 S.W.3d 144, 149-50 (Tex. App. — San Antonio 2004, pet. ref'd) (counsel ineffective in failing to challenge**

21

**biased venireman for cause and for not peremptorily striking him where his omission was inadvertent and not strategic).**

Trial Court's Finding of Fact 64 is not supported by the record or clearly established law. A review of the record demonstrates that the trial court would not have committed reversible error in denying a challenge for cause on McKay, Crutcher, or Green. *See supra* at 13-20 (detailed discussion on each venireperson); *see also*, *Adanandus v. State*, 866 S.W.2d 210, 222 (Tex. Crim. App. 1993) (providing that the grant or denial of a challenge for cause is within the discretion of the trial court).

The only Court of Criminal Appeals case cited above fails to provide legal support for the trial court's finding, because it is factually distinguishable from the instant case. *Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978). In Hernandez, unlike the instant case, the venireperson demonstrated a clear bias against the appellant by her "belief that a police officer would always tell the truth." *Id.* at 950. The other cases cited in the above finding not only have no precedential value with respect to the Court of Criminal Appeals, but are also distinguishable on their facts. *See Winn v. State*, 871 S.W.2d 756, 762 (Tex. App. — Corpus Christi 1993, no pet.)(venireperson stated that she was acquainted with and "that she would believe" one of the State's witnesses and "did not feel she could be impartial"); *Montez v. State*, 824 S.W.2d 308, 310 (Tex. App. — San Antonio 1992, no pet.)(challenge for cause was denied where venireperson "admitted to a 'tendency to be unfair and a little biased' because of her knowledge and experience of the danger of drugs") *State v. Garza*, 143

S.W.3d 144, 149-50 (Tex. App. ─ San Antonio 2004, pet. ref'd)(prospective juror was biased against the defendant based on a similar incident happening to his daughter-in-law and stated that he would give more weight to a police officer's testimony).

Thompson provided the applicant with overall effective representation during the *voir dire* portion of the trial by providing accurate explanations of the law; educating the jury on issues specific to the case, such as witness credibility and motives to lie; eliciting responses on various topics helpful to the defense, such as lying during divorce proceedings and people falsely accused of a sexual offense; eliciting responses in areas subject to a challenge for cause, such as venireperson 14 who would have required the applicant to testify and venireperson 11 who would not hold the State to its burden of beyond a reasonable doubt; asking two questions that required a response from every venireperson on the issues of punishment and presumption of innocence; and demonstrating a competence in knowledge and execution in jury selection (II R.R. at 103-190)(Thompson's portion of *voir dire* examination and discussions at the bench regarding challenges for cause and by agreement).

Thus, because there is no "clear abuse of discretion" in any of Judge Bacon's rulings during jury selection, the State objects to Trial Court's Finding of Fact No. 64 as contrary to the record and not supported by clearly established law. *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

> **Trial Court's Finding of Fact 65 (partial)**
>
> **… The Court finds that Cenikor is widely-known in the community as a drug rehab program …**
>
> **Trial Court's Finding of Fact 68**
>
> **Thompson knew before trial that Linda had a history of drug and alcohol abuse; the defense made the strategic decision before the trial to try to exclude and not elicit this evidence (2 H.R.R. 9-10). He admits that this testimony was irrelevant; the State did not give him pre-trial notice of its intent to offer this extraneous misconduct; and it violated the order in limine obtained by the State (AX 2 at 3; 1 H.R.R. 119-20, 125). He should have objected to it; his failure to do so was inadvertent, not strategic; and he waived error without any strategic reason (AX 2 at 4; 1 H.R.R. 118-20, 126). He did not consider objecting outside the jury's presence and it would have been appropriate to do so because the State violated the order in limine (1 H.R.R. 133-34; 2 H.R.R. 222).**
>
> **Trial Court's Finding of Fact 69**
>
> **Thompson performed deficiently in failing to object to this inadmissible, prejudicial testimony.**

The State objects to Trial Court's Findings of Fact 68 and 69, as they are not supported by the record and are contrary to clearly established law. Specifically, Thompson's conduct was not objectively deficient for failing to object to testimony about the applicant and Linda Dietrich meeting in drug rehab and the applicant getting kicked out of the program.

The record reflects that on direct examination the prosecutor asked the complainant "how did [the applicant] become a part of your house," and the complainant non-responsively answered that (a) the applicant met her mother, Linda,

24

at a "women's detox facility" which was "drug rehab," (b) Linda did not live there, (c) Linda "went to an Alcoholics Anonymous meeting there" and the applicant was there, and (d) a couple of months later the applicant "was kicked out of Cenikor or left Cenikor" (III R.R. at 12-13). Later in the trial, Judge Bacon conducted a hearing outside the presence of the jury during Thompson's cross-examination of the complainant to discuss the prosecutor's objection to a question asked by Thompson; the trial judge and both attorneys discussed the motion in limine entered by the trial judge, and Thompson pointed out that the prosecutor violated the motion in limine by bringing out allegations about the applicant's drug abuse during the complainant's testimony without first approaching the trial judge; Thompson stated that he "didn't want to call any additional attention it [sic], but – "; and Judge Bacon addressed Thompson's comment by stating that "you need to object when it happens, don't you," to which Thompson responded, "Yeah." (III R.R. at 75-81).

However, Thompson testified in the writ evidentiary hearing that he knew that this disputed portion of the complainant's testimony was objectionable and harmful to the defense; that he did a quick balancing of how harmful the testimony was to the defense versus calling the jury's attention to the testimony; that he knew that in order to preserve error, if his objection was sustained, it would have been necessary to highlight the harmful testimony twice - once when he objected to it and once when the jury was instructed to disregard the testimony; and that he made an in-trial strategic decision not to object for these reasons (I W.H. at 119-20, 124-132)(II W.H.

25

at 131-34).  Further, the portion of the complainant's testimony about the applicant meeting Linda at a "women's detox facility" or "drug rehab" did not present evidence to the jury of any present drug or alcohol use by Linda or the applicant (III R.R. at 12-13).  Likewise, the portion of the complainant's testimony that the applicant and Linda met and "a couple of months later he was kicked out of Cenikor or left Cenikor" did not present any evidence of the applicant's present drug or alcohol use (III R.R. at 12-13).

In fact, although Cenikor may be widely-known in the **criminal justice** community as a drug treatment facility, there is no support in the trial or habeas record that the jury shared this knowledge.  The specific portion of the complainant's testimony that the applicant and Linda met and "a couple of months later he was kicked out of Cenikor or left Cenikor" did not necessarily present any evidence of the applicant's past difficulties with drugs or alcohol, because the complainant never expounded on or explained the meaning or significance of Cenikor to the jury; the complainant's testimony was not specific as to the applicant's manner of departing Cenikor; and Cenikor was never mentioned again or explained during the remainder of the guilt/innocence stage of trial.

Therefore, Thompson's strategic decision not to object to testimony that he believed implicated the applicant in some form of drug-related misconduct had a plausible basis of not calling the jury's attention to this evidence.  (I W.H. at 126-28); *See Ex parte Davis*, 866 S.W.2d 234, 242 (Tex. Crim. App. 1993) (under *Strickland* there

26

is a presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment"). Notwithstanding Thompson's testimony at the writ evidentiary hearing that **"in hindsight"** he should have approached the bench when he heard the disputed portion of the complainant's testimony, Thompson's decision not to object or approach the bench was reasonable trial strategy in light of his concerns that he would highlight the testimony even by approaching the bench (I W.H. at 130)(II W.H. at 222-23). *See Strickland*, 466 U.S. at 669 (warning against the "distorting effects of hindsight" when reviewing counsel's performance).

Finally, the above findings are not supported, because Judge Bacon would not have committed reversible error in overruling an objection to this testimony, because the complainant's response provided contextual evidence regarding the relationships between the parties and was relevant to explain the circumstances of the complainant's home-life. *See Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986)(holding that the "jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum"). Thus, Thompson's conduct was not objectively deficient with respect to the testimony regarding how Linda and the applicant met and that the applicant left Cenikor, and the record does not support that the trial judge would have either sustained any objection lodged or that she would have committed error in overruling the objection. *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996).

27

**Trial Court's Finding of Fact 74**

**Morgan performed deficiently in eliciting this inadmissible, prejudicial testimony.**

Trial Court's Finding of Fact 74 regarding the applicant's trial counsel, John Morgan, eliciting testimony at trial that Linda had a history of drug use and had been a member of Alcoholics Anonymous for ten (10) years is not supported by the record and established law.

Prior to Morgan calling Linda in the applicant's case-in-chief, the complainant had testified pursuant to the prosecutor's direct examination that (a) the applicant met Linda at a "women's detox facility" which was "drug rehab," (b) Linda did not live there, (c) Linda went to an Alcoholics Anonymous (AA) meeting there and the applicant was there, (d) a couple of months later the applicant "was kicked out of Cenikor or left Cenikor," (e) the applicant moved into the complainant's family's home located on Camden in Pasadena, (f) the applicant and the complainant's family moved to a home on Princess in South Houston, (g) the complainant moved out of the home on Princess when she was fifteen (15) years old to live with her father because she was being raped, (h) the complainant moved back to the home on Princess when she was 16 years old in order to take care of her little brothers because they had no guidance since Linda had a "drug habit," (i) the complainant later got married in New Orleans, (j) the complainant informed Linda of the marriage and

Linda became angry, and (k) the complainant became worried about Linda's "drug use" (III R.R. at 12-13, 16-17, 19-21).

During Linda's testimony as the only defense witness during guilt/innocence, Morgan told Linda that the jury had already received "brief evidence regarding drug use on [her] part" and asked, "Are you presently under the influence of any drugs or alcohol?," to which Linda responded, "I'm on medication. I have a back injury;" Morgan asked Linda if she was "currently attending any type of treatment program," and Linda responded, "Yes, I have ten years AA"; Morgan asked Linda, "[w]hat is your status with them at this time?," and Linda responded, "I have ten years sober in AA;" and, Morgan asked Linda, "When was your last use of alcohol?" and Linda responded that her "sobriety date [was] May 1st of 1997" and her "last use of alcohol would be the last day of April of 1997…" (III R.R. at 118-19).

The issue of whether Linda was intoxicated at the time of her testimony was addressed during the applicant's motion for new trial hearing in 2007. Morgan testified during the motion for new trial hearing that there had "been some talk about [Linda] being intoxicated" during trial but Morgan did not think Linda was impaired when she testified in trial (VII R.R. at 17-18). Kathryn Rozelle testified in the motion for new trial hearing that Linda was impaired when she testified in the applicant's trial (VIII R.R. at 20-21). Davida Acker testified in the motion for new trial hearing that she observed Linda when she testified in the applicant's trial, and that Linda was "definitively intoxicated" because she had "slurred speaking" and "dilated eyes" and

29

"[was] falling asleep in the courtroom;" and, that Acker never informed the applicant's defense attorneys of Linda's impairment but confronted Linda about her intoxicated state (VIII R.R. at 74-76). Most importantly, the applicant testified in the motion for new trial hearing that Linda was impaired when she testified during trial and that her impairment was "obvious;" that he informed Morgan about Linda's impairment; that a lady in the courtroom confronted Linda about her impairment, and Linda became "hysterical;" and, that Morgan requested that the applicant get Linda to calm down (X R.R. at 34).

The Trial Court's finding does not reference, and seemingly ignores, the above testimony about Linda's intoxication at trial, as well as Morgan's testimony in the motion for new trial hearing discussing his representation of the applicant at trial. Likewise, Morgan's assertion in his 2011 affidavit provided to habeas counsel that he had no "tactical reason" to ask Linda whether, at the time of her testimony, she was under the influence of any drugs or alcohol and whether she was attending any treatment program is unpersuasive based in part on the circumstances at the time of his direct examination of Linda at trial, which included that:

- although neither defense attorney thought Linda was intoxicated, Morgan had received information about concerns that Linda was intoxicated or impaired prior to her trial testimony;

- the jury had already received evidence about Linda's drug and/or alcohol abuse and efforts for rehabilitation during the complainant's earlier testimony before the defense case-in-chief commenced;

30

- if Morgan recognized that the jury might observe signs of impairment in Linda during her testimony that was consistent with the information which he had received about her possible impairment, it would have been reasonable trial strategy to ask her about this;

- Thompson testified at the writ evidentiary hearing that friends and family of the applicant who knew Linda better than Morgan or he knew her believed that she was impaired, so it would have been reasonable trial strategy to bring out any explanation for her odd behavior other than the abuse of drugs or alcohol;

- Morgan was faced with the decisions of whether to address the issues of (a) Linda testifying while possibly impaired – or to avoid this issue and allow the jury to evaluate Linda's credibility in light of the possibility that the jury might observe signs of impairment in Linda while knowing from the complainant's testimony about Linda's drug and/or alcohol abuse past – and (b) Linda's history of drug and/or alcohol abuse by eliciting testimony about her efforts for rehabilitation and lengthy sobriety – or to avoid this issue and allow the jury to evaluate Linda's credibility based on the undisputed evidence that Linda abused drugs and/or alcohol;

- Linda's response that she was on medication for a back injury corroborated the information told to Morgan that Linda possibly manifested signs of impairment;

- Linda's testimony that she was presently taking medication for a back injury explained for the jury any signs of impairment manifested while she testified; and,

- Morgan's decision to ask Linda (a) whether she was presently attending any type of treatment program and (b) about the status of such treatment program was a reasonable response to the complainant's earlier testimony about Linda's drug and/or alcohol abuse and elicited favorable evidence concerning Linda's prolonged efforts for rehabilitation through AA and her lengthy ten-year sobriety.

Morgan's decision to ask Linda about whether she was presently under the influence of drugs or alcohol was a reasonable trial strategy that had a plausible basis

31

of helping the jury to understand the reason for any unusual speech, demeanor or behavior possibly exhibited by Linda during her testimony. *Harrington v. Richter,* 562 U.S. 86, 104-12 (2011)(citing *Strickland* at 691). Morgan's decision to ask Linda about her participation in a treatment program was reasonable trial strategy that had a plausible basis of contextualizing the complainant's earlier testimony about Linda's drug and/or alcohol history and informing the jury of Linda's prolonged efforts for rehabilitation. *Id.* Morgan's decision to ask Linda about her last use of alcohol was reasonable trial strategy that had a plausible basis of bolstering Linda's credibility by informing the jury of her successful, lengthy ten-year sobriety. *Id.*

Thus, because Morgan's decisions to ask Linda the questions about drugs and alcohol were reasonable under the circumstances, the trial court's finding of deficient conduct by Morgan in his direct examination of Linda is not supported by the record and is contrary to established law. *See Harrington*, 562 U.S. at 104-12 (providing that the question in deciding if there was deficient conduct by counsel is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom).

EXTRANEOUS SEXUAL ASSAULTS

**Trial Court's Finding of Fact 78**

**Eliciting this prejudicial testimony [the extraneous sexual assaults] where the State failed to do so was not reasonable professional performance by defense counsel. Thompson should have cross-**

32

examined Samantha only about the acts to which she testified instead of eliciting the numerous extraneous offenses.

**Trial Court's Finding of Fact 82**

**If this was Thompson's strategy [trying to show that the complainant's allegations were incredible], it was unsound because the testimony was so prejudicial. See Moore v. Johnson, 194 F.3d 586, 611 (5th Cir. 1999). No rational juror could have disregarded the volume of encounters and their graphic detail. Moreover, the allegations to which Samantha testified on direct examination were not "over the top" and did not justify Thompson's decision to reveal the numerous alleged extraneous incidents.**

**Trial Court's Finding of Fact 84**

**Thompson admits that his strategy was unsound based on how Samantha's direct examination evolved and that he would not pursue this strategy again if he were representing applicant at a retrial (Thompson Supp. Aff. at 7; 1 H.R.R. 148-49; 2 H.R.R. 234).**

**Trial Court's Finding of Fact 85**

**Thompson performed deficiently in eliciting this prejudicial testimony regarding numerous extraneous offenses.**

The State objects to the Trial Court's Findings of Fact 78, 82, 84, and 85 as not supported by the record or established law. These findings, that trial counsel's conduct was deficient for eliciting testimony about the applicant's extraneous sexual assaults of the complainant, not only judge Thompson's conduct through the lens of hindsight, but also completely ignore Thompson's common-sense reasoning that a jury is more likely to find testimony about numerous aggressive and violent sexual acts incredible than an outcry with minimal details.

During Thompson's cross-examination of the complainant, he purposely elicited details about the applicant forcing her to perform oral sex about twenty-five (25) times; forcing her into vaginal intercourse about fifty (50) times; forcing her into anal intercourse once; performing oral sex on her between three (3) and five (5) times; forcefully and aggressively kissing the complainant's mouth by shoving his tongue into her mouth; biting the complainant during the sexual assaults; and, physically restraining her by pinning her down with his legs (III R.R. at 60-66). Thompson agreed with habeas counsel during the writ hearing that this strategy, when viewed in hindsight, was not good "given the way the trial turned out" (IX R.R. at 29-31)(I W.H. at 147-150). However, a review of the trial and habeas records provides no support for the trial court's finding that Thompson's strategy to discredit the complainant by eliciting her "over the top" allegations was unsound.

In fact, Thompson elaborated on his strategy during the writ evidentiary hearing, explaining that:

- Thompson's primary strategy in the case was to attack the complainant's credibility, and Thompson believed that the complainant appeared more credible to a jury with the minimal testimony of two (2) sexual assaults than her "over the top" allegations, which included her claim that the applicant was able to forcefully rape her after his severe head injury;

- Trial counsel had information from their pretrial witness meetings that the complainant was an actress; that she told an ex-boyfriend that she committed murder, then immediately said it was a joke; and that she liked to make up fanciful stories to attract attention;

34

- The complainant admitted on cross-examination that she had many family members and loved ones in her life that would have helped her; and that she actually did move out twice during this time period, but moved back in with the applicant still living there;

- Thompson believed that the jury would have a harder time thinking that a little girl would stay in a home for six (6) years being molested and raped anally, vaginally, and orally over fifty (50) times and not make outcry to law enforcement to end – or attempt to leave the home to escape – the sexual abuse;

- Although Thompson did not personally see the jury's reaction to the complainant's testimony, Morgan's observation that there were jurors crying after she testified is an indication that they believed her version of the events; and,

- Trial counsels' strategy was derived with the goal of an acquittal by convincing the jury that the complainant was lying; if they were trying the case over the punishment issue, then the applicant would have pled guilty to the State's pretrial offer of five (5) years deferred adjudication.

(I W.H. at 138-45); (II W.H. at 140-47); *See Ex parte Davis*, 866 S.W.2d 234, 242 (Tex. Crim. App. 1993) (under *Strickland* there is a presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment"); *compare*, *Moore v. Johnson*, 194 F.3d 586, 611 (5th Cir. 1999)(finding no conceivable benefit where defense counsel agreed not to introduce the parts of the defendant's confession potentially helpful to his defense after the prosecutor introduced only the parts harmful to the defense).

Thus, the trial and habeas records do not support the above findings with respect to Thompson eliciting additional testimony from the complainant regarding

the number and manner of the sexual assaults. *See Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979) (declining to "second-guess through hindsight" the strategy of counsel, and providing that the fact that another attorney might have pursued a different course will not support a finding of ineffectiveness).

ALLEGED FAILURE TO CALL WITNESSES

**Trial Court's Finding of Fact 94**

**Thompson could have called Rives to impeach complainant's credibility by rendering his opinion as to her reputation or his opinion regarding her character trait for "truthfulness," and was prepared to do that, but he did not. (1 H.R.R. at 157), The prosecutor told Thompson after the complainant had finished testifying that he had emails that undermined Rives' credibility and showed him some "my space" emails and web pages (9 R.R. 79), regarding Rives' involvement in "witchcraft" or a cult (1 H.R.R. at 158). Thompson did not read the emails or ask to do so, nor did the prosecutor refuse to let him see them. He did not tell the court that he needed to see the emails to make a strategic decision whether to call Rives (1 H.R.R. 158-59). Instead, he decided not to call Rives without personally meeting or speaking with him (9 R.R. 50-51) and without seeing the emails, which he admits was not a sound strategic decision (1 H.R.R. 160). He trusted the prosecutor without conducting an independent investigation (1 H.R.R. 161).**

**Trial Court's Finding of Fact 95**

**At the time of trial, Thompson did not know or research whether Rives could have been impeached with the emails if they existed (1 H.R.R. 171). He now admits that such impeachment would have been improper (1 H.R.R. 173-79, 184). His strategic decision not to call Rives was based on his misunderstanding of the law regarding whether Rives could be impeached.**

**Trial Court's Finding of Fact 97**

**Thompson admits that he should have made a bill of exceptions or offer of proof to preserve this issue for appellate review, that he also should have argued that he had a constitutional right to confront and cross-**

36

**examine Samantha with this information, and that these omissions were inadvertent, not strategic (AX 2 at 5; 1 H.R.R. 155, 169-70). He performed deficiently in failing to do so.**

The State objects to Trial Court's Findings of Fact 94, 95, and 97 regarding trial counsels' decision not to call Ricky Rives[2] to testify that it was his opinion that the complainant had bad character for truthfulness, because they are not supported by the record, especially the evidence in the motion for new trial hearing, and are contrary to established law.

During his cross-examination of the complainant at trial, Thompson attempted to question her concerning her lying to Rives about committing a murder, but the trial judge sustained the prosecutor's objections and disallowed this line of questioning (III R.R. at 75-81). Nonetheless, Thompson was still aware that Rives was an ex-boyfriend of the complainant's that could have testified about the complainant's bad character for truthfulness from his pretrial investigation (IX R.R. at 44-45, 50-51).

Morgan testified about this in the motion for new trial hearing, namely that Rives and Morehead (another ex-boyfriend) were contacted and subpoenaed for court; that Morgan had access and the opportunity to review the State's prosecution file except for the work product; that Morgan was aware that the State was in possession of "stacks" of e-mails and reputation evidence relating to Rives and Morehead; that Morgan was aware that the State possessed evidence of chronic drug

---

[2] This witness is referred to as "Ricky Reeves" in the trial record and in the *State's Proposed Findings of Fact and Conclusions of Law*, however "Rives" and "Reeves" are one and the same person. *See, e.g.,* (III R.R. at 75).

37

use and involvement in a cult; that Morgan was aware that presenting testimony from Rives and Morehead could hurt the applicant's case; and, that Morgan and Thompson made the strategic decision not to present testimony from Rives and Morehead (VII R.R. at 26-27). Thompson also testified about this issue in the motion for new trial hearing, specifically that the trial prosecutor discussed Rives with Thompson; that the prosecutor showed Thompson e-mails and "MySpace" webpages related to Rives; that Thompson learned that Rives was involved in a cult; that Thompson knew that some "interesting" character evidence would be presented if Rives testified in trial; and that Thompson was concerned about the potential damage to the applicant's case after presenting defense character witnesses who would be discredited by the State (IX R.R. at 79-80, 80-81).

A review of the appellate and habeas records fails to show any objectively deficient conduct by trial counsel with respect to Rives, but rather demonstrates that Thompson and Morgan made a strategic decision not to present testimony from Rives, which had a plausible basis of trying to avoid damaging the applicant's case from Rives being discredited by the State. Even though Thompson testified at the writ evidentiary hearing that he had an erroneous understanding of whether the prosecutor could impeach Rives with information in the e-mails, his decision not to call Rives was still part of a reasonable trial strategy in light of the fact that:

- the prosecutor notified him near the end of the trial that he had e-mails that could potentially damage Rives' credibility, along the lines that he was involved in witchcraft or a cult;

- Thompson's recollection is that a family member brought the e-mails to court and gave them to the prosecutor during trial;

- Thompson knew the prosecutor, and trusted him;

- Thompson cannot recall the details of his conversation with the prosecutor, but made his decision not to call Rives after their discussion;

- Thompson knew it would hurt the defense case if he called Rives to testify that the complainant had a bad character for truthfulness, and the prosecutor was able to discredit the witness on cross-examination;

- Thompson had to make the in-trial strategy decision of balancing the potential benefit of an ex-boyfriend testifying that the complainant did not have a good reputation for truthfulness versus the potential harm to the defense case if Rives was discredited with any admissible impeachment evidence or something that became relevant based on a non-responsive answer, a possible bias, or to clear up a false impression with the jury; and,

- Thompson believes that after considering the potential benefit versus potential harm, that it was reasonable trial strategy not to call Rives.

(I W.H. at 152-53, 154-59, 161, 184, 236).

Thus, the trial court's findings with respect to trial counsels' decision not to call Rives are unsupportable based on a review of the appellate and habeas records under established law. Thompson made a strategic decision not to call Rives based on an evaluation of the potential risks and rewards at the time of trial. *See Blott*, 588 S.W.2d at 592 (declining to "second-guess through hindsight" the strategy of counsel, and providing that the fact that another attorney might have pursued a different course will not support a finding of ineffectiveness).

39

**Trial Court's Finding of Fact 124**

**To the extent that Thompson made a strategic decision not to call Morehead and Rives based on the prosecutor's "threat" to impeach Rives with emails, My Space entries and Morehead's emails that strategy was unsound where he did not review the purported emails that Keagle had made Thompson "aware of" (9 R.R. 80), without showing him the actual emails as well as the non-disclosed My Space communication between the complainant and Morehead, before making the decision. He performed deficiently in failing to call them.**

The State objects to Trial Court's Finding of Fact 124, as it is not supported by the trial and habeas records and is contrary to established law.

Morehead could potentially have testified, with the proper predicates, about his opinion of the complainant's bad character for truthfulness and the complainant's bad reputation in the community for truthfulness under Rule 608(a); however, Morehead could not testify concerning the complainant's past lies and him not believing the complainant when she claimed to be sexually abused by the applicant under Rules 403 and 608(b).

Thompson testified in the motion for new trial hearing that he knew about Morehead, another of the complainant's boyfriends, and had a conversation with him when he came to court; that Thompson was aware that the State possessed e-mails reflecting that Morehead was still romantically interested in the complainant and that the nature of this interest negatively impacted Morehead's credibility; that Thompson knew that Morehead was willing to testify that the complainant had a bad character for truthfulness; and, that Thompson considered presenting the testimony of

40

Morehead but, in light of his "baggage," made the decision not to call him as a witness even though Morehead was present in court to testify (IX R.R. at 45-46, 51). Thompson testified further in his cross-examination at the motion for new trial hearing that Keagle made Thompson aware of e-mails which related to Morehead's character; that Thompson was made aware of other motivations that would cause Morehead to testify negatively about the complainant; that Thompson believed that Morehead would be a good defense witness but for Thompson's concern about the prosecutor's ability to impeach Morehead; and, that Thompson was concerned about the potential damage to the applicant's case after presenting defense character witnesses who would be discredited by the State (IX R.R. at 79-80, 80-81).

Thus, Thompson and Morgan made a strategic decision not to present testimony from Morehead, and that strategic decision had a plausible basis of trying to avoid damaging the applicant's case from Morehead being discredited by the State. The decision not to call Morehead was part of a reasonable trial strategy in light of the fact that:

- Thompson was aware that the complainant had previously told Morehead that the applicant had sexually assaulted her from his review of the offense report as part of his pretrial preparation, but that Morehead did not believe her;

- Thompson had still intended to call Morehead to testify about his opinion of the complainant's truthfulness and anything else he might have been able to get in;

41

- prior to calling Morehead, the prosecutor notified Thompson that he had information that could be used to impeach and discredit Morehead;

- Thompson did not see the "MySpace" message between Morehead and the complainant, admitted in the instant habeas proceeding as Applicant's Exhibit 4, prior to or during the applicant's trial;

- Thompson agreed that there were things in the message that he hopefully could have used to undermine the complainant's credibility, such as her doubts that the applicant would be convicted, that her interview went horribly, and that she was upset that Morehead told the police that he did not believe her;

- even if the message had been available to Thompson at the time of trial, an objective review of the message reveals that the complainant never stated that the sexual assaults did not happen; that bits and pieces could be pulled out of the message to ask the complainant about; but that the message also contains information that would have been helpful to the State's case and/or harmful to the defense, namely: (1) the complainant states that she hopes the applicant admits to the offense, which makes no sense if she knew the allegations were made up; (2) the complainant speculates that the applicant will say she seduced him, and is outraged that he would think a twelve-year-old can seduce a grown man; (3) the message is proof of another person the complainant told about the sexual assaults, with fairly consistent facts; (4) the complainant is concerned that the applicant will not be convicted because she waited so long to tell about the assaults; (5) the message, and her previous outcry to Morehead, shows that she told somebody about the assaults prior to the financial motive used as one of the defenses in trial; (6) there was nothing in the message indicating she was trying to "round up" witnesses to lie, but rather only mentioned Morehead and Acton, the two witnesses already mentioned in the offense report; and (7) the message gives some confirmation to the fact that she told people about the assaults before she moved out of the applicant's house; and

- trial counsel had to make the in-trial strategy decision of balancing the potential benefit of an ex-boyfriend testifying that the

42

complainant did not have a good reputation for truthfulness versus the potential harm to the defense case if Morehead was discredited with any admissible impeachment evidence or something that became relevant based on a non-responsive answer, a possible bias, or to clear up a false impression with the jury.

(I W.H. at 223, 225, 230-33)(II W.H. at 166-171).

Therefore, the trial court's finding that Thompson's representation was deficient when he failed to call Morehead as a witness in the applicant's trial, is not supported by the record and is contrary to established law, as trial counsel made a strategic decision not to call Morehead based on an evaluation of the potential risks and rewards at the time of trial. *See Blott*, 588 S.W.2d at 592 (declining to "second-guess through hindsight" the strategy of counsel, and providing that the fact that another attorney might have pursued a different course will not support a finding of ineffectiveness).

**Trial Court's Finding of Fact 133**

**Assuming arguendo that Thompson made a strategic decision not to call Acton because he did not want the jury to hear that Samantha told Acton that applicant walked in on her while she showered and undressed, Thompson admits that this decision was unsound where he also made the unsound strategic decision to elicit testimony about the quantity and nature of the sexual assaults (2 H.R.R. 246-47).**

**Trial Court's Finding of Fact 134**

**Thompson performed deficiently in failing to impeach Samantha with the fact that she did not report any sexual abuse to Acton, as she claimed.**

43

The State objects to Trial Court's Findings of Fact 133 and 134, that trial counsel was deficient for failing to call Shannon Acton – the complainant's friend at the time of the sexual abuse – to testify that the complainant never informed her that she was being sexually assaulted by the applicant, as they are not supported by the record.

These findings mischaracterize the details in the statement Acton gave to police to suggest an accidental "walk-in" devoid of any sexual abuse. In fact, Acton's statement provided that:

> Sometime near 7th or 8th grade, Samantha told me that Kyle Dietrich her stepfather had begun to watch her while she was in the shower. She did not tell me many details about this. She told me that I was to keep this a secret. … I don't remember specifically when Samantha first told me about Kyle, but I think the only thing she mentioned was him watching her shower and constantly walking in on her while she was undressed.

*Applicant's Ex. 7.* Further, the trial court makes the perplexing connection that Thompson's decision not to call Acton was unsound due to his other strategy to elicit details about the extraneous offenses from the complainant.

Thompson was unable to discover before trial the substance of Acton's potential testimony because when the defense investigator contacted her she was unable to meet, and closer to the trial date the investigator was unable to reach her to be interviewed (II W.H. at 180). Notwithstanding Thompson's testimony at the writ evidentiary hearing that he believed there was information in Acton's statement that was helpful to the defense and that it would have been "the better thing to do" to

44

have her attached, his decision not to call Acton was part of a reasonable trial strategy in light of the fact that:

- Thompson had reviewed Acton's statement in the offense report, which reflected that Acton was a friend of the complainant, and that when they were in 7th grade the complainant told her that the applicant would watch her take showers and watch her get undressed;

- Thompson would not want to sponsor a witness without asking questions in addition to what was provided in her statement;

- even if, in hindsight, Thompson wishes he had Acton attached, her presence in court would have also made her available as a witness for the State, and he still would not have known if her testimony would do more harm than good;

- Acton's testimony, even if limited to what she provided in her statement to police, would have made the jury aware of deviant acts by the applicant against the complainant when she was twelve-years-old, and would have weakened the defense's claims that the complainant never told anyone about the applicant's actions before moving out of his house and before having a financial motive against the applicant; and,

- it is unlikely that the complainant's failure to tell Acton about the applicant forcing her into oral sex would have helped the defense's case more than the jury hearing about his desire to see his twelve-year-old stepdaughter naked would have hurt their case.

(I W.H. 202, 206, 218)(II. W.H. at 183-85).

Thus, the finding that trial counsel's conduct was deficient for failing to call Acton is not supported by the record, because there was no evidence provided that Acton was available to testify in the applicant's trial or that Acton's testimony was

45

favorable to the applicant. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983);

*Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986).

> **Trial Court's Finding of Fact 147**
>
> **Thompson and Morgan performed deficiently in failing to present this good character testimony [regarding the safe and moral treatment of children] where that decision was based on a misunderstanding of the law. Cf. Horton v. State, 411 S.E.2d. 223, 224 (S.C. 1991) (counsel performed deficiently in advising defendant inaccurately that, if he testified, he could be impeached with prior convictions that were inadmissible).**
>
> **Trial Court's Finding of Fact 148**
>
> **Had the trial court admitted evidence of applicant's prior criminal history to rebut this good character testimony over applicant's objection, an appellate court probably would have reversed the conviction. See Baize, 790 S.W.2d at 66.**
>
> **Trial Court's Finding of Fact 149**
>
> **When Thompson decided not to present this testimony, he did not know about the caselaw holding that testimony of this nature did not open the door to the defendant's criminal history not involving children (AX 2 at 10; 2 H.R.R. 17, 20-21). Thompson admits that he should have discovered this caselaw and presented testimony regarding applicant's good character for the safe and moral treatment of children. His failure to do so was not based on sound strategy after an adequate investigation. He performed deficiently in this regard.**

The State objects to Trial Court's Findings of Fact 147-49, that Thompson's

conduct was deficient for failing to present character evidence in the guilt/innocence

phase of trial that the applicant treated children safely and morally, as not supported

by the record and contrary to established law.

46

Clyde Williams represented the applicant during the motion for new trial hearing, at which she presented testimony from George Fotsch, Paige Koerner, Kathryn Rozelle, David Taft, Jacqueline Phoenix Kronjaeger, Donna Firmin, Elaine Rankin, Sharon Walker, Davida Acker, James Rozelle, Lynn Chamberlain, Sarah Bergman, and Douglas Phoenix related to their opinion about the applicant's good character for the safe and moral treatment of children and/or their knowledge about the applicant's good reputation in the community for his character for safe and moral treatment of children (VII R.R. at 85-86, 94; VIII R.R. at 9-12, 35-36, 46-47, 52, 56-57, 69, 76, 80-81, 85-86, 97-98, 112-13).

Thompson testified in the motion for new trial hearing on September 6, 2007, that the applicant was not going to testify in the guilt stage; that Thompson was aware that the applicant had friends that could testify as to him having safe and moral relations with children; that Thompson did not want to present any character evidence for truthfulness or lawfulness because he was concerned that this evidence might open the door to evidence of the applicant's prior convictions under Rule 609; that Linda provided some testimony about the applicant's character for safe and moral relations with children; that Thompson was concerned with the State repeating all sexual abuse allegations already heard by the jury with each character witness presented by the defense to determine whether any unknown information would change the witness' opinion about the applicant's character trait; that Thompson believed based on the primacy/recency effect that the more the jury heard the sexual

47

abuse allegations repeated the more likely it would be for the jury to "take it as fact;" that Thompson did not believe that presenting character witnesses to testify about the applicant having safe and moral relations with children would open the door to evidence of the applicant's prior criminal history; and, that Thompson believed that calling character witnesses in the guilt stage to testify about the applicant having safe and moral relations with children would not have a good impact on the jury (IX R.R. at 46-50).

Consequently, Thompson made the strategic decision not to present character witnesses to testify about the applicant's safe and moral relations with children in the guilt stage of trial, and this strategic decision had a plausible bases of preventing the prosecutor from repeating the sexual abuse allegations with each character witness and of completely denying Judge Bacon even the remotest opportunity to make a ruling that allowed the State to present evidence of the applicant's criminal history (I W.H. at 191-92). Notwithstanding Thompson's testimony at the writ hearing that he did not research this issue prior to trial, his decision not to present any character witnesses to testify about the applicant's safe and moral relations with children in the guilt stage of trial was still part of a reasonable trial strategy in light of the fact that:

- Thompson was aware of and considered presenting character witnesses to testify about the applicant's safe and moral relations with children in the guilt stage;

- Trial counsels' overall trial strategy was to (a) attack the complainant using her mother to make such attack and (b) keep the jury from hearing anything about the applicant;

- Thompson's plan to implement this trial strategy was not to put the applicant's character into evidence during guilt/innocence and keep evidence of the applicant's criminal past out of the guilt/innocence stage;

- If the jury learned that the applicant was out trying to pick up a prostitute after his serious head injury, this would have undermined the defense theory that the complainant's claim that the applicant raped her after his accident was completely incredible because he was a homebound person needing a caretaker that had just relearned how to walk and talk;

- Thompson, while not believing that Judge Bacon was biased or unfair to criminal defendants, was aware of her reputation in the Harris County courthouse for being "State's-minded" and of the fact that she commonly ruled in favor of the State when exercising her judicial discretion;

- even if evidence of a specific character trait does not automatically open the door to the applicant's criminal history, Thompson made an in-trial judgment call that the risk of a non-responsive answer or responses to questions about the potential witnesses' relationship with the applicant or their motives to testify could have opening the door enough for the prostitution conviction to come in far outweighed the potential benefit of friends and/or family members giving good character testimony;

- Even if the door was not opened in any manner, after each witness testified about  the applicant's character, including the trait of having safe and moral relations with children, the prosecutor would question each character witness about the sexual abuse evidence before the jury in order to determine whether any information unknown to the character witness affected the character witness' opinion about that character trait; and,

- Notwithstanding the guilty verdict, Thompson was successful in implementing this trial strategy in that the jury never heard any evidence about the applicant's prostitution conviction or Maryland case during the guilt stage.

(IX R.R. at 71, 79-80, 85-86)(I W.H. at 14)(II W.H. at 98, 193-94).

49

This stands in sharp contrast to the South Carolina case cited in the above finding where the trial counsel gave the defendant advice based on a misunderstanding of the law, and there was no other strategic reason for that advice found in the record. *Horton v. State*, 306 S.C. 252, 254-55, 411 S.E.2d 223, 224 (1991). The State further objects to Trial Court's Finding of Fact 148, because it is unsupported speculation and conjecture, namely predicting that if Thompson had called a character witness in the guilt/innocence phase of trial, then the door would not have been opened into the applicant's prior criminal history; and if so, then Judge Bacon would have allowed the State to elicit inadmissible testimony from that witness; and if so, then Thompson would have objected; and if so, then Judge Bacon would have overruled that objection; and if so, then the appellate court probably would have reversed the conviction.

Thus, the record does not support a finding of deficient conduct with respect to trial counsels' decision to reserve the character witnesses, including evidence of the applicant's safe and moral treatment of children, for the punishment stage of trial. *See Blott v. State*, 588 S.W.2d at 592 (declining to "second-guess through hindsight" the strategy of counsel, and providing that the fact that another attorney might have pursued a different course will not support a finding of ineffectiveness).

In fact, the difficulty in deciding which witnesses to present in a trial or hearing was evident in the instant habeas proceeding, where the applicant initially alleged that trial counsel was ineffective for failing to call Cynthia Elaine Rankin to testify about

50

the complainant's bad character for truthfulness and the applicant's character for safe and moral treatment of children, but abandoned this claim during the writ evidentiary hearing. Cynthia Elaine Rankin testified in the motion for new trial hearing that she was a self-employed attorney; that Rankin befriended the applicant around the fall of 2001; that Rankin also knew the complainant and her mother; that Rankin visited the Dietrich home on many social occasions; that Rankin did not come to the applicant's trial, but would have if she had been contacted by the applicant's attorneys; that Rankin would not have required a subpoena to attend the applicant's trial; that Rankin knew the applicant's reputation in the community for having safe and moral relations with children, and his reputation was "very good;" that Rankin had an opinion about the applicant's character for having safe and moral relations with children, and her opinion was that his character trait was "Exceptional;" that Rankin knew the complainant's reputation for truthfulness, and her reputation was bad; that Rankin knew of Linda's reputation in the community for truthfulness, and her reputation was bad; that the applicant testified for Rankin in one of her civil trials involving a custody battle; that Rankin thought the applicant's testimony in her trial was crucial and "his ability to testify made our case;" and, that Rankin believed that the applicant was capable of testifying on his own behalf (VIII R.R. at 55-60).

On first glance, it appears that Rankin would have been an excellent witness for the applicant to call during the guilt phase of trial; however, a closer look at her relationship with the applicant reveals that she represented the applicant in his Harris

51

County prostitution case. *See State's Writ Exhibit A, judgment and sentence.* Although this claim was abandoned by habeas counsel during the instant proceeding, the circumstances surrounding Rankin are illustrative of how a witness can potentially surprise you with damaging evidence during trial, in that, if Rankin had been called by trial counsel to testify in the applicant's trial, there is a significant likelihood that the prosecutor would have been able to elicit information on cross-examination about her representation of the applicant in his prostitution case that occurred after he suffered his serious head injury (I W.H. at 172-76).

The Fourteenth Court of Appeals also reviewed trial counsels' decisions regarding which witnesses to present to the jury when on direct appeal the applicant claimed, in part, that he received the ineffective assistance of counsel at trial because counsel only presented the testimony of Linda during the defense's case-in-chief. *Dietrich v. State*, No. 14-07-005410-CR, 2009 WL 838161 (Tex. App. – Houston [14th Dist.] 2009)(not designated for publication). The appellate court overruled this issue, and provided the following summary:

> In sum, the record reflects that both attorneys who represented the [applicant] reviewed the facts of the case, discussed their options with [the applicant], and made strategic decisions regarding which witnesses to call. "It is axiomatic that appellant's constitutional right to counsel does not mean errorless counsel where competency or adequacy of representation is argued or judged purely by hindsight."

*Dietrich v. State*, No. 14-07-005410-CR, 2009 WL 838161 *5 (quoting *Holland v. State*, 761 S.W.2d 307, 320 (Tex. Crim. App. 1988).

Thus, the trial court's findings that trial counsels' representation was deficient with respect to failing to call various witnesses are not supported by the record and are contrary to established law.

<u>IMPEACHING THE COMPLAINANT</u>

**Trial Court's Finding of Fact 101**

**Applicant had a Sixth Amendment right to cross-examine Samantha and introduce evidence demonstrating that she made a prior false allegation of sexual assault to undermine her credibility. <u>Thomas v. State</u>, 669 S.W.2d 420, 423 (Tex. App — Houston [1st Dist.] 1984, pet. ref'd). He could have introduced evidence that she previously made false allegations that she was sexually assaulted by an unknown Hispanic male.**

**Trial Court's Finding of Fact 102**

**Thompson performed deficiently in failing to elicit testimony about the Hispanic male allegation and, if necessary, preserve the issue for appellate review.**

**Trial Court's Finding of Fact 129**

**Thompson and Morgan performed deficiently in failing to impeach Samantha and, when necessary, make bills of exceptions or offers of proof that Samantha made prior false allegations of sexual misconduct against an unknown Hispanic male, made statements to Morehead and Rives that undermined her credibility, and that Samantha had a bad reputation for truthfulness. Cf. Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002); <u>Everage v. State</u>, 893 S.W.2d 219, 223 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd); <u>Ex parte Ybarra,</u> 629 S.W.2d 943, 946 (Tex. Crim. App. 1982).**

The State objects to Trial Court's Finding of Fact 101-102 and 129, that trial counsel's conduct was deficient for failing to impeach the complainant about her

"false" accusation of being sexually assaulted by an unknown Hispanic male in Strawberry Park in Pasadena, Texas, as they are contrary to established law.

The appellate and habeas records reflect that during a pretrial meeting with witnesses, Thompson was told that the complainant had made a false accusation about being sexually assaulted by an unknown Hispanic male in Strawberry Park in Pasadena, Texas; that Thompson was informed by Linda that a medical exam was conducted which established the falsity of the accusation; that Thompson believed that the Dietrichs did not believe the complainant because they thought she was using this accusation to cover up her staying out late; that Thompson was not aware of the complainant writing any letter which admitted to the falsity of this accusation to explain her coming home late; that Linda could not identify for Thompson the doctor's office or hospital where the medical exam took place; that Thompson knew that he would have to prove the accusation was false before it would be admissible; that the complainant never admitted to anyone that the accusation was false; that the only evidence Thompson had about the statement's falsity was the opinion of Linda, the witness testifying to help the applicant; and that Thompson could not independently prove the falsity of the Strawberry Park accusation (IX R.R. at 23-24, 26-28)(I W.H. at 186)(II W.H. at 162-66).

Therefore, Thompson made the strategic decision not to question the complainant about the Strawberry Park accusation, and this strategic decision had plausible bases in that Thompson believed that the trial judge would not allow this

line of questioning and hoped that the prosecutor, who was not aware of this accusation, would unknowingly open the door to this evidence later in trial (I W.H. at 188-89, 196). Notwithstanding Thompson's testimony at the writ evidentiary hearing that "in hindsight" it was not a sound tactical decision not to ask the complainant about the false accusation, Thompson's decision was part of a reasonable trial strategy in light of the fact that:

- Thompson was leading up to cross-examining the complainant about the Strawberry Park accusation after his questioning of the complainant concerning the false admission about committing murder when the trial judge removed the jury and admonished the defense;

- Thompson did not want to request a hearing or make a bill of exception to determine the admissibility of the Strawberry Park accusation, because he believed that the State did not know about the Strawberry Park accusation, he did not want to lose the element of surprise concerning this evidence, and he was "trying to play it close to the vest;"

- Thompson, based on his knowledge of and experience with the trial judge, believed that she would not have allowed questioning the complainant about the Strawberry Park accusation after a hearing to determine its admissibility; and,

- Thompson was still hoping that the State might open the door to evidence of the Strawberry Park accusation later in trial.

(I W.H. at 188-190, 194, 197)(II W.H. at 239).

Even assuming that an allegation of being raped by a stranger in a public park was determined to be similar to the complainant's accusation against the applicant, who was her step-father, there was no evidence presented at trial or on habeas that the Strawberry Park accusation was, in fact, false. Therefore, Judge Bacon would not

have committed reversible error by prohibiting Thompson from questioning the complainant about the Strawberry Park accusation. *See Lopez v. State*, 18 S.W.3d 220, 222-26 (Tex. Crim. App. 2000)(providing that the trial court maintains broad discretion in determining if a prior accusation is admissible, and requiring a showing that the prior accusation is **false and similar to the charged offense**) (emphasis added). Although the lower court opinion provided by the trial court in Finding 101 has no precedential value in the instant proceeding, it does confirm that before a prior accusation by the complainant is admissible it must be shown to be false. *See Thomas v. State*, 669 S.W.2d 420, 423 (Tex. App.—Houston [1ˢᵗ Dist.] 1984, pet. ref'd)(holding that the false accusation was admissible where the appellant showed, through the admission of the complainant and the testimony of her mother, that at least one of the prior accusations was false).

The applicant cannot show that Thompson provided the applicant with objectively deficient representation for failing to impeach the complainant with the Strawberry Park accusation or make a bill of exception or offer of proof on this issue, because the trial court would have properly excluded any testimony on this issue. *See Wiggins v. Smith*, 539 U.S. at 521 (for ineffective assistance of counsel claims, a defendant must meet the standard established in *Strickland* by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense"). Therefore, the State objects to Trial Court's Findings of Fact 101-102 and 129, as they

are not supported by the appellate and habeas records and are contrary to established law.

**Trial Court's Finding of Fact 115**

**Thompson should have discovered Samantha's statements from the MySpace communications and used them to impeach her. He did not ask the court to order Keagle to disclose them but admits that he should have discovered them as a result of the State's open file (1 H.R.R. 228, 335). His failure to do so constituted deficient performance.**

The State objects to the Trial Court's Finding of Fact 115, as it mischaracterizes the content of the MySpace messages sent from the complainant to Charles Morehead. *Applicant's Ex. 4* (MySpace messages admitted in writ evidentiary hearing). Further, because the record reflects that Thompson was unaware of these messages prior to trial, and it is unclear whether they were even available, his conduct was not deficient for failing to impeach the complainant with the messages (I W.H. at 225); *See also, Thompson's affidavits; supra* at _____ (more detailed discussion of the content of the message); *Harrington v. Richter,* 562 U.S. at 104-12 (deficient conduct exists where an attorney's representation amounted to incompetence under "prevailing professional norms").

**Trial Court's Finding of Fact 128**

**Morgan admits that his failure to make a bill of exceptions or offer of proof [regarding lies the complainant told her mother] was inadvertent and not strategic (AX 3 at 2). He performed deficiently in this regard.**

The State objects to Trial Court's Finding of Fact 128, that trial counsel should have made a bill of exception or offer of proof after the trial court sustained the prosecutor's objection to their attempt to impeach the complainant through questioning Linda about the complainant lying on many occasions, as this finding is not supported by the record and is contrary to established law.

Morgan asked Linda during direct examination how she would characterize the complainant's truthfulness, and Linda responded, "Not very high;" that Morgan asked Linda if she had caught the complainant telling stories that were not true on few or many occasions; that the prosecutor objected on grounds of improper character evidence and relevance; and, that the trial judge sustained the prosecutor's objection (III R.R. at 139).

Morgan elicited testimony from Linda about the complainant's character for being untruthful, which is specifically allowed under Rule 608(a) of the Texas Rules of Evidence. The trial court properly sustained the prosecutor's objections to Morgan's attempt to elicit testimony from Linda about her catching the complainant telling few or many lies in the past, as this was an attempt to introduce specific instances of the complainant's conduct to establish her general character for being untruthful which was prohibited under Rule 608(b). *See also, Hammer v. State*, 296 S.W.3d at 563 (specific instances of lying are generally not admissible).

The record does not support a finding that Morgan's conduct was deficient with respect to his failure to make a bill of exception or offer of proof on Linda's

potential testimony about catching the complainant telling lies in the past, as this

testimony was properly excluded under established law.    *Id.*

LACK OF PREJUDICE

> **Trial Court's Finding of Fact 152**
>
> **Counsel's deficient performance significantly contributed to the conviction.  Had the jury not heard inadmissible, prejudicial evidence and had counsel presented favorable testimony that would have undermined Samantha's credibility, there is a reasonable probability that the outcome of the proceeding would have been different.  *See Strickland*, 466 U.S. at 696 ("verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").**
>
> **Trial Court's Finding of Fact 153**
>
> **But for counsel's errors, considered collectively, there is a reasonable probability that the jury would have acquitted applicant or deadlocked.  Had counsel preserved error regarding the voir dire examination or had the court overruled timely objections to the inadmissible testimony, or excluded admissible testimony and counsel preserved error, there is a reasonable probability that any conviction would have been reversed on appeal.**
>
> **Trial Court's Finding of Fact 154**
>
> **Applicant's conviction is not worthy of confidence, and he is entitled to a new trial.**

The State objects to Trial Court's Findings of Fact 152-54, as they are not

supported by a review of the trial and habeas records.

The trial court is correct that the outcome of the applicant's trial "hinged on

whether the jury believed [the complainant] beyond a reasonable doubt."   *Trial Court's*

*Finding of Fact 150*.    On August 31, 2007, two months after the applicant's trial,

Morgan testified in the applicant's motion for new trial hearing that he believed the jurors had made up their mind once the complainant testified, and that some of the jurors were crying in the jury box after her testimony (VII R.R. at 23). Simply put – the jury believed the complainant – despite the delayed outcry and her own mother testifying against her.

In light of this, and notwithstanding any alleged deficiency in defense counsel's representation, the applicant failed to establish prejudice in the instant proceeding. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(for ineffective assistance of counsel claims, a defendant must meet the standard established in Strickland by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense").

THE PUNISHMENT PHASE

**Trial Court's Finding of Fact 162 (partial)**

**…The Court finds Thompson's testimony shifting from believing on direct examination that the burglary was a final conviction to later being led by the prosecutor now testifying he believed it was a "true deferred" to be curious, puzzling and not credible.**

The State objects to the above portion of Trial Court's Finding of Fact 162 as not supported by the record. Although deference is usually given to the trial court's credibility determinations, this is a credibility determination made on Thompson's testimony in the motion for new trial hearing – testimony that the current trial judge did not observe. Judge Bridgwater, after hearing the testimony of Thompson and the other witnesses, denied the applicant's motion for new trial (X R.R. at 70). Further, a

60

review of Thompson's entire testimony on this issue demonstrates that his testimony was not "shifting," but rather that he was unsure of the final disposition of the Maryland prior, as follows:

<u>On direct examination</u>

COUNSEL: Okay. Going back to the prior conviction, would it be true that neither you, as the Defense attorney, or the State ever got the documents regarding the out of state charge, conviction or whatever it was?

THOMPSON: Correct.

COUNSEL: And why did you decide not to purse that?

THOMPSON: To get documentation that our client was not probation-eligible?

COUNSEL: Well, I mean, you didn't really - - you hadn't examined the documents to really know whether or not he was probation-eligible; isn't that correct?

THOMPSON: Well, you know, we had filed the application on that, based on his testimony that - - getting those, the J and Ss from up north would have only hurt us in a sense. The State was having trouble finding it. I had been in touch with Alexis Gilbert who was the prior prosecutor regarding that because we were worried about, you know, a reindictment type of situation with the prior allegation.

She had indicated the letters had been sent. Nothing was found regarding that. Based on my experience as a prosecutor, someone had gone and tried to look for that and hadn't been able to find that. The simple thing to do would have been to pick up the phone, hire an investigator up there and say, Go down to the courthouse and get it. If we had done that, my belief is some clerk would have gone, "Hey, State, we found these J and Ss you're looking for,"

61

and sent them off to the State which would have hurt our client.

COUNSEL: There is one other possibility, isn't there, that those documents could have proved that it wasn't a final felony conviction, or that if it was a final felony conviction, that it was invalid?

THOMPSON: That is a possibility, yes, ma'am.

COUNSEL: But you didn't check that out?

THOMPSON: Strategically I believed it would have been in my client's - - it was not in my client's best interest to produce those documents and possibly have them forward to the State.

COURT: When you said that you filed an application, are you talking about the application for probation?

THOMPSON: Yes, sir.
COURT: Go ahead.

COUNSEL: Okay. But had it not been a final conviction, you could have known - - voir dired the jury on probation, you could have prepared witnesses for a probation argument in the punishment hearing.

THOMPSON: Well, **based on our discussions with Dietrich, I believed it to be a final conviction.**

(X R.R. at 39-41) (emphasis added).

On cross-examination

STATE: And, in fact, you **thought** his conviction - - excuse me - - his burglary of a habitation out of Maryland, you thought, in fact, they were a true deferred that had been terminated and, therefore, could not be used against him? **At some point you thought that, correct?**

THOMPSON: Correct.

62

STATE: Because you filed a motion for probation?

THOMPSON: Well, when we **re-questioned** him about that, he indicated he was **uncertain** about that. And out of an abundance of caution, we chose to file that application and have him testify regarding that.

STATE: And, in fact, Mr. Thompson, if you would have found out that those were convictions out of Maryland, you would have not, under the Code of Ethics, professional responsibility, been able to file that motion for probation in good faith, would you have?

THOMPSON: Correct.

STATE: So **if you would have known it wasn't a deferred,** you couldn't have even filed the motion for probation?

THOMPSON: Correct.

STATE: And you remember the State - - or maybe you don't remember - - the State did voir dire about probation?

THOMPSON: They did. We had a limited amount of time on voir dire. I believe it was 30 minutes.

(X R.R. at 71-72) (emphasis added).

Thus, the trial court's credibility determination cannot be supported by a review of the testimony as a whole.

**Trial Court's Finding of Fact 191**

**Thompson performed deficiently in failing to adequately investigate applicant's criminal record. <u>Ex parte Poole</u>, 738 S.W.2d at 286; <u>Ex parte Felton</u>, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991); <u>Ex parte Jordan</u>, 879 S.W.2d 61, 62 (Tex. Crim. App. 1994); <u>Ex parte Langley</u>, 833 S.W.2d 141, 143 (Tex. Crim. App. 1992).**

63

The State objects to Trial Court's Finding of Fact 191, that trial counsel performed deficiently by failing to investigate the applicant's criminal record in Maryland to determine whether he had a final felony conviction, as this finding is not supported by a review of the record as a whole, including the testimony of Thompson regarding his strategic reasons for this decision.

On June 26, 2007, the applicant filed a motion for community supervision in which he indicated that he "was given 7 yrs. Probation before Judgment in Maryland 22 yrs ago" (I C.R. at 54). The applicant testified in the punishment phase of trial that he had gotten in trouble in Maryland for burglary and received a seven-year "probation before judgment" for this burglary but was not convicted for that offense (V R.R. at 40-41). The trial court's punishment charge included an instruction that the jury could assess community supervision as the applicant's punishment (I C.R. at 69-70). Thompson argued in punishment summation that the applicant was eligible for probation because he received a "deferred" in Maryland (V R.R. at 70).

A review of the appellate and habeas records reflects that Thompson made the strategic decision not to initiate or conduct any independent investigation into the applicant's Maryland case, and this strategic decision had the plausible bases of (a) allowing Thompson to ethically assist the applicant in attempting to obtain community supervision from a jury if the applicant was convicted as Thompson was unsure about whether the Maryland case was a final felony conviction; and (b) not assisting the State in possibly securing official court documents from the Maryland

case sufficient to establish the finality of the felony conviction in order to avoid the State possibly re-indicting the applicant with some enhancement allegation or proving to the jury that the applicant had a final felony prior conviction. This decision not to initiate or conduct any independent investigation into the applicant's Maryland case was part of a reasonable trial strategy in light of the fact that:

- Thompson knew about the applicant's 1985 breaking and entering case in Maryland from conversations he had with the applicant, and the State's pretrial notice of the applicant's prior criminal history;

- Thompson initially believed, based upon information from the applicant, that the Maryland case was a final conviction; however, after re-interviewing the applicant, Thompson thought that he was placed on a "deferred" probation, which was terminated and could not be used against the applicant;

- Thompson did not think that the State could secure the official documents to establish the finality of this conviction, and did not believe the documents in the State's file were sufficient;

- Thompson reviewed the documents pertaining to this case in the State's file at each court setting, checking to see if the State had received any additional documents; however, he did not ask the prosecutor about them directly because he did not want to share his concerns;

- Thompson never obtained the documents to determine if the applicant's Maryland case was a final felony conviction;

- Thompson did not want to investigate further or obtain the official judgments from Maryland, because he was concerned that if he looked into it further it would be a felony conviction;

- Thompson was concerned that any investigation that he initiated might have assisted the State in securing official judgments from Maryland which could result in the applicant not being

"probation-eligible" or in the State re-indicting the applicant with the prior conviction alleged for enhancement purposes;

- Thompson concluded that it was not in the applicant's best interests to attempt to locate the official judgments from Maryland, and made a strategic decision not to do so;

- Thompson did not believe the State could prove the Maryland case was a felony; and did not believe the documents ultimately admitted over his objection were sufficient judgments;

- discussions at the bench regarding the Maryland prior, included that the applicant may be eligible for the probation instruction if he received a disposition similar to a deferred adjudication in Texas;

- Thompson felt that it was important to get a probation instruction in the jury charge, because it allowed him to argue for probation and, even if the jury assessed a prison sentence, he hoped the lowering of the punishment range would skew the sentence lower;

- because Thompson had a good faith basis to believe the Maryland prior might not be a felony conviction, he assisted the applicant in filing a "motion for probation," disclosing the Maryland case by inserting the language "I was given seven years probation before judgement in Maryland 22 years ago;"

- Thompson could not have ethically assisted the applicant in filing a motion for probation if he was aware that the applicant's cases in Maryland were final felony convictions, not deferred probations;

- that Thompson argued for the trial court to include a probation instruction in the jury charge even though Thompson did not know whether the defense was entitled to such a probation instruction;

66

- although the jury ultimately chose to assess a prison sentence, the trial court instructed the jury on the applicant's eligibility for community supervision;

- Thompson was able to argue for the jury to assess probation, as follows:

  > Now, you have been given a wide range in the Charge to consider, anywhere from five years probation to ten years probation, anywhere in that. All the way from five years in jail all the way up to 99 years or life and/or a 10,000-dollar fine.

  > That gives you probably the widest range of discretion of any offense out there and what to do . . .

  > Now, you know, we have to prove by a preponderance of the evidence that he is probation eligible. And this happened in Maryland and you haven't heard any testimony from a lawyer who practices in Maryland. But you have heard that his belief is that his sentence was suspended. In fact, a deferred, and that his is still eligible; and,

- Thompson's goal was to convince the jury to assess the applicant's punishment with a probated sentence, not to be correct about the status of the Maryland prior.

(V R.R. at 44, 67, 70)(Thompson's objection to the admission of the Maryland documents and excerpts from closing argument regarding probation)(IX R.R. at 13-14, 39-41, 71-75)(II W.H. at 24, 43-48, 53-56, 197-202, 211-14).

The trial court's finding that Thompson performed deficiently when he failed to initiate or conduct any independent investigation into the applicant's Maryland case is not supported by the trial and habeas records, as Thompson made a strategic decision not to do so based on an evaluation of the potential risks and rewards at the

67

time of trial. *See Blott v. State*, 588 S.W.2d at 592 (declining to "second-guess through hindsight" the strategy of counsel, and providing that the fact that another attorney might have pursued a different course will not support a finding of ineffectiveness); *contrast, Ex parte Pool*, 738 S.W.2d 285, 286 (Tex. Crim. App. 1987) (counsel relied on misinformation from prosecutor, did no independent investigation, and had no strategy for this decision); *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991) (defendant's punishment was enhanced with a prior that could not be used and counsel did not know the applicable law); *Ex parte Jordan*, 879 S.W.2d 61, 62 (Tex. Crim. App. 1994) (invalid out-of-state case where the defendant had not waived counsel was used to enhance his punishment); *Ex parte Langley*, 833 S.W.2d 141, 144 (Tex. Crim. App. 1992) (defendant's sentence was enhanced with a case where he received shock probation).

**Trial Court's Finding of Fact 192**

**As a result of his inadequate investigation, Thompson also performed deficiently in failing to advise applicant not to testify and to rest behind the State. Cf. Menefee v. State, 175 S.W.3d 500, 505-506 (Tex. App. — Beaumont 2005, no pet.); Cooper v. State, 769 S.W.2d 301, 305 (Tex. App. — Houston [1st Dist.] 1989, no pet.).**

Trial Court's Finding of Fact 192 regarding trial counsel's advice to the applicant after the State rested, is not supported by the record and is contrary to established law.

Morgan presented mitigation testimony in the punishment phase from John Williams, David Taft, Douglas Phoenix, James Rozelle, and Nicholas Hunt, the complainant's brother (IV R.R. at 34-36)( V R.R. at 4-6, 11-13, 20-22, and 23-25). The applicant testified in the punishment stage that he worked as a traffic light service technician; was involved in a job-related accident in 2002 from which he suffered serious injuries, including a hole in the skull; was in a coma for a week and a half; had to subsequently undergo physical therapy to re-learn to walk, speak, and use the right side of his body; was separated from Linda for about a year and a half; could comply with all conditions of probation set out by the trial court; had a prior conviction for prostitution from soliciting a 45-year-old woman; had a burglary offense in Maryland that resulted in a seven-year term of "probation before judgment;" was not convicted for the burglary offense in Maryland; understood but did not agree with the jury's verdict; and did not commit and would not take responsibility for the sexual assault offense against the complainant (V R.R. at 32-42).

Thompson did not provide the applicant with objectively deficient conduct with regard to his advice in the punishment phase of the applicant's trial in light of the fact that:

- Thompson strongly advised the applicant not to testify in the guilt stage of trial, and the applicant accepted Thompson's advice and chose not to testify in the guilt stage;

- Thompson believed that the applicant would have testified in the guilt stage if Thompson would have wanted the applicant to do so;

69

- Thompson prepared the applicant to testify by questioning him in a "mock fashion" during two office meetings;

- Thompson and Morgan concluded that the applicant should not testify in trial, based on the applicant's angry responses to mock cross-examination questions; his lack of memory due to the head injury; and their belief that the applicant could not have withstood a cross-examination by a competent prosecutor;

- although Thompson recommended that the applicant not testify in the punishment stage, his recommendation was not "strongly worded," because Thompson did not think that the applicant's punishment testimony would have helped or hurt the applicant much after the jury's guilty verdict and his testimony could help prove that he was eligible for probation;

- the applicant told Thompson that he wanted to testify in the punishment phase of trial;

- despite Thompson's recommendation that the applicant not testify in both the guilt and punishment stages of trial, the applicant made the personal decision to testify in the punishment stage;

- once the applicant insisted on testifying, the defense put on numerous witnesses who, even when informed about the applicant's prior criminal history, provided strong evidence of the applicant's good character; that the applicant had support in the community if granted probation; and that they knew him well and trusted him around their children;

- in his closing arguments to the jury on punishment, Thompson pointed out the State's failure to call any witnesses on the impact of the offense, and contrasted this fact with the applicant's strong support, as follows:

    > They can consider the State's failure to call certain witnesses. And they didn't call any witnesses. You didn't get to hear any impact testimony from their side. And I think that speaks volumes.

    > What you did hear from Mr. Dietrich's side, you heard concerned friends that have known him for years in

70

this community, work with him closely. His boss, in spite of all this, ex-HPD officer, says, "You know what? He's got this job. He still has this job. He can come back and work here if he wants."

You've heard from two life-long friends. "You know, I trust him. I trust him around my kids." Yeah, and both of them said, "I didn't believe this happened." Take that into account.

Then you heard from two young people that Mr. Dietrich has mentored throughout their lives and helped. Never saw anything inappropriate. Thinks he is a good person. That you can consider in assessing the appropriate punishment.

And, lastly, we put Mr. Dietrich on the stand so you could here [sic] him and what he had to say.

- Thompson agreed that, in hindsight, the applicant should have heeded his advice and not testified in the punishment phase based upon the feedback he received after the trial; and finally,

- trial counsel could not have advised the applicant to rest immediately after the State rested, because the applicant exercised his right to testify in the punishment stage.

(V R.R. at 69-70)(excerpt from Thompson's closing argument on punishment); (IX R.R. at 16-20, 74); (II W.H. at 51-52, 56-57, 203-12); *see also, Rock v. Arkansas*, 483 U.S. 44, 49 (1987)(providing that "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense").

Thus, because the applicant exercised his right to testify in his own defense and trial counsel's advice was reasonable under the circumstances, Trial Court's Finding of Fact 192 is not supported by the record and is contrary to established law.

71

IV.

Conclusion

The State respectfully requests that the Court of Criminal Appeals find that the trial and habeas records do not support the trial court's October 9, 2015 findings of fact and conclusions of law recommending habeas relief. Additionally, the State respectfully requests that the Court of Criminal Appeals enter an order denying the applicant relief on all grounds urged in the instant post-conviction habeas petition.

V.

A copy of the *State's Objections to the Trial Court's Findings of Fact, Conclusions of Law and Order* in cause number 1072796-A has been sent electronically to josh@joshschafferlaw.com and by regular mail to:

Josh Schaffer
Counsel for Applicant
1301 McKinney, Suite 3100
Houston, Texas 77010


and to:

Brian Wice
440 Louisiana, Suite 900
Houston, Texas 77002

SIGNED this 28th day of December, 2015.

Respectfully submitted,

/s/ Linda Garcia
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
713-274-5990
713-755-5240 (fax)
Texas Bar ID # 00787163
garcia_linda@dao.hctx.net